959 F.2d 297
 139 L.R.R.M. (BNA) 2891, 294 U.S.App.D.C. 351
 METROPOLITAN WASHINGTON AIRPORTS AUTHORITY PROFESSIONAL FIRE
FIGHTERS ASSOCIATION LOCAL 3217, INTERNATIONAL
ASSOCIATION OF FIRE FIGHTERS,
AFL-CIO-CLC, and Jimmie Pete,
President, Appellants,
v.
UNITED STATES of America, et al., Appellees.
 No. 89-5411.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 17, 1992.
Decided March 24, 1992.
 
 Appeal from the United States District Court for the District of Columbia.
 Anton G. Hajjar, Washington, D.C., for appellants.
 Peter W. Tredick, with whom Paul C. Skelly, Washington, D.C., was on the brief, for appellee Metropolitan Washington Airports Authority. William T. Coleman, Jr., Donald T. Bliss, Debra A. Valentine and Nancy E. McFadden, Washington, D.C., also entered an appearance for the Authority.
 Matthew M. Collette, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty, and Douglas Letter, Atty., Dept. of Justice, Washington, D.C., were on the brief, for federal appellees.
 Before: BUCKLEY, WILLIAMS and SENTELLE, Circuit Judges.
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 National and Dulles Airports are federally-owned, and until 1987 were operated by the Federal Aviation Administration. In late 1986 Congress authorized the Secretary of Transportation to transfer the airports' control to a newly-created regional entity, the Metropolitan Washington Airports Authority, by means of a 50-year lease. Metropolitan Washington Airports Act of 1986, 49 U.S.C. app. §§ 2451-2461. The Secretary made the transfer in 1987. The union representing airport firefighters (who had been employed by the FAA but were transferred to the Authority's employ), together with its president, sued the United States, the Department of Transportation, the Secretary, and the Authority, claiming that the labor provisions of the lease and certain conduct of the Authority under the lease violate the Act. In two separate rulings the district court granted summary judgment for defendants. Federal Firefighters Ass'n, Local 1 v. United States, 723 F.Supp. 821 (D.D.C.1989) ("Federal Firefighters Ass'n I" ); Federal Firefighters Ass'n, Local 1 v. United States, 723 F.Supp. 825 (D.D.C.1989) ("Federal Firefighters Ass'n II" ).[1] We address first the claims that the Secretary and the Authority violated the Act in executing the lease (as well as a claim based on the Secretary's later decision allowing the lease to take effect), then the claims that later behavior of the Authority also violated the Act.
 
 
 2
 Our jurisdiction is grounded in 28 U.S.C. § 1331, the general federal question statute. While § 6005(e) of the Act, 49 U.S.C. app. § 2454(e), explicitly creates federal court jurisdiction to enforce the terms of the lease,[2] many of the claims arise under the Transfer Act itself, coupled with the Administrative Procedure Act, 5 U.S.C. § 702.I. Claims that the Lease Violates the Act
 
 
 3
 The Act imposes a duty on the Authority to "continue all collective bargaining rights enjoyed before the date the lease takes effect by employees of the Metropolitan Washington Airports". 49 U.S.C. app. § 2454(c)(6)(D). It also directs the Secretary to "ensure", no later than the effective date of the lease, that the Authority "has established arrangements to protect the employment interests of employees during the 5-year period beginning on [the lease] date". Id. § 2457(a). Section 2457(a) goes on to list five specific arrangements that are to be covered by the lease's provisions during those first five years: (1) the adoption of existing labor agreements and the continuation of employee collective bargaining rights; (2) for employees wishing to transfer, retention in their same positions; (3) wages "at or above" the employees' pre-transfer salaries; (4) credit for leave accrued at the FAA; and (5) insurance plans "reasonably comparable" to those available to federal employees on the transfer date. Finally, § 2457(b)(2) requires that arrangements made pursuant to § 2457 must assure continuation of "all collective bargaining rights" enjoyed by transferring employees for the full 50-year lease term. Plaintiffs contend that the Secretary has failed to continue pre-existing collective bargaining rights for the duration of the lease and to provide the assurances required for the lease's first five years.
 
 
 4
 "Limitations" and the denial of a right to strike: Plaintiffs argue that the Secretary has undercut the employees' bargaining rights (see item # 1 above) with Article 14.B(1) of the lease, which requires the Authority to promulgate a labor code to assure airport employees "the same rights and limitations with respect to labor agreements as the Federal Aviation Administration and its Employees enjoyed on October 18, 1986". (Emphasis added.) They object on the same basis to Article 14.B(2), which states that the employees "are subject to the employment limitations of 5 U.S.C. Chapter 73, Subchapter II to the same extent as ... on October 18, 1986." Those limitations include 5 U.S.C. § 7311, which denies federal employees any right to strike.
 
 
 5
 Neither the carryover of "limitations" from federal-sector bargaining generally nor the specific limitation on strikes violates the Act. When a set of "rights" is transferred, it makes no sense to say that they come free of the associated limitations. Explicit reference to the limitations is just a useful linguistic device for expressing the scope of the rights transferred. If the limitations did not come along, then the rights would not be merely transferred but would be inflated, so that to speak of a "continuation" would be meaningless.
 
 
 6
 This is not to say that the associated change of context may not require some adjustment of the rights transferred. Before the transfer, Congress exercised direct, immediate control over the employees' wages as part of its control over those of federal employees generally. As a result of the transfer, the employees are for the first five years from the effective date of the lease (June 7, 1987) to be paid "at or above the rates of pay in effect" on the effective date, 49 U.S.C. app. § 2457(a)(3). For the last 45 years, the statute is a blank. Particularly for the latter period, the argument can be made that the lapse of direct congressional oversight calls for compensating changes in the employees' other means of securing pay increases. On the other hand, since Congress itself enacted these changes of circumstances in the very same piece of legislation, it is hard to see why it simply called for "continuation" of prior bargaining rights if it thought that the new setting called for a change.
 
 
 7
 At most the change of circumstances creates a "gap" for the Secretary to fill under Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837, 843-44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). See, e.g., District Lodge 64 v. NLRB, 949 F.2d 441, 445 (D.C.Cir.1991). Indeed, the Act implicitly recognizes the need for secretarial flexibility, saying that "[t]he Secretary shall include such other terms and conditions applicable to the parties of the lease as are consistent with and carry out the provisions of this subchapter." 49 U.S.C. app. § 2454(c)(11). Given the statutory floor under wages for the first five years, as well as the potential for later congressional intervention on the employees' behalf, the change of context is not severe enough to render the Secretary's interpretation unreasonable.[3] We find the disputed lease provisions valid.
 
 
 8
 Degree of specificity: The union claims that the lease is defective in failing to address the employee rights issues in greater detail than the Transfer Act itself. But judicial deference is at its highest in reviewing an agency's choice among competing policy considerations, see Pauley v. Bethenergy Mines, Inc., --- U.S. ----, 111 S.Ct. 2524, 2534, 115 L.Ed.2d 604 (1991), including the choice here of the level of generality at which it will promulgate norms implementing a legislative mandate. Cf. Boyce Motor Lines v. United States, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952) (upholding against void-for-vagueness challenge a regulation framed in terms not much more specific than the statute it implemented). As the lease must cover a period of 50 years from its effective date, the Secretary's decision to use the statutory terms seems unimpeachable.
 
 
 9
 Coverage of the full 50 years: The union argues that the lease does not satisfy the Act's requirement that employee rights be protected throughout the 50-year lease term. It notes that although 49 U.S.C. app. § 2457(b)(2) provides that the arrangements made under § 2457 "shall assure, during the 50-year lease term, the continuation of all collective bargaining rights enjoyed by transferred employees retained by the Airports Authority", Article 15 of the lease covers only the first five years (paralleling § 2457(a)). But we think Article 14 fills any gap as to the remaining 45 years: Article 14.A requires that "[a]ny labor agreements shall provide for the continuation of all collective bargaining rights enjoyed by the Employees before the effective date"; Article 14.B requires the Authority to adopt a labor code "to assure" that all transferring employees "have the same rights and limitations with respect to labor agreements as ... they enjoyed on October 18, 1986". As these provisions will last the lease's full 50 years, they satisfy the Act.
 
 
 10
 Certification of fulfillment of conditions precedent: The union next contends that the Secretary let the lease take effect without adequate assurance of the continuation of certain employee rights. The Act required the Secretary, "[n]ot later than the date the lease ... takes effect," to "ensure that the Airports Authority has established arrangements to protect the employment interests of employees during the 5-year period beginning [that date]", 49 U.S.C. app. § 2457(a), within the five specified categories. As we have seen, the Secretary sought to accomplish this by including in the lease certain conditions precedent to its taking effect. Specifically, the lease required the Authority to "establish[ ] arrangements to protect the employment interests of Employees" during the first five years and specified the five points identified in § 2457(a). See Article 15. On June 5, 1987, the Secretary certified that all conditions precedent had been met and declared the lease effective as of June 7, 1987.
 
 
 11
 The record supports the Secretary's decision to certify fulfillment of the conditions. The Authority adopted existing collective bargaining agreements on June 3, and airport employees were retained at existing or higher levels of pay when the lease took effect. The union does not allege that employees failed to receive credit for accrued leave and seniority rights. The union's only real claim relates to the fifth item, regarding health insurance plans.
 
 
 12
 On that score, the Act required provision of at least three health insurance plans "reasonably comparable" in cost and coverage to those previously available.[4] Article 15.A(5) of the lease duly reiterated this as a condition precedent.
 
 
 13
 In fact, the Authority offered a Blue Cross plan with three variations (High, Standard and Preferred Provider Options) and three different Health Maintenance Organization plans. The health insurance package was based upon an advisory memorandum prepared by the Office of Personnel Management, which has regulatory responsibility for federal employees' insurance plans, see 5 U.S.C. §§ 8716, 8913. Once the package was ready, the Secretary submitted it to OPM, which found the selection "reasonably comparable". Joint Appendix ("J.A.") 135. Indeed, OPM concluded that each of the proposed Blue Cross plans was not only comparable, but had more favorable coinsurance levels and lower deductibles than those available to federal employees taking Blue Cross. Id. at 135-36. In addition, premiums under some of the plans were lower than they are for federal employees. See J.A. 143, 198 (Blue Cross High Option premium $83.02 for airport employees but $174.77 for federal employees); J.A. 144, 200 (Capital Care family plan premium $34.50 for airport employees but $59.74 for federal employees). In view of these options, plaintiffs' objection--that the HMO plans do not have facilities within convenient reach of some employees living quite distant from the airports--is not enough to support a claim that the Secretary's certification was arbitrary or capricious.
 
 
 14
 II. Alleged Violations Following Execution and Certification
 
 
 15
 of the Lease
 
 
 16
 The next set of claims relate to conduct of the Authority under the Act and lease. Plaintiffs attack two specific decisions--the Authority's refusal to bargain with the union over wages and its adoption of a policy on sick and annual leave accrual. They also attack a "Labor Code" promulgated by the Authority, especially the definition of "strike" that the code used to implement the lease provision adopting the federal-sector ban on employee strikes.
 
 
 17
 Before addressing the merits, we note that the federal defendants' only connection to the Authority's conduct lay in their capacity to take steps against it to enforce the Act and lease. But exercises of agency discretion not to bring enforcement actions are normally unreviewable because "committed to agency discretion by law". 5 U.S.C. § 701(a)(2); see Heckler v. Chaney, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). As the plaintiffs invoke no exception to this principle, the federal defendants' inaction on these matters is not under review.
 
 A. Refusal to bargain over wages
 
 18
 In February 1988 the union and the Authority began negotiations to renew the existing collective bargaining agreement. The Authority refused to bargain over wages, hours, and certain other conditions of employment. This refusal was based on a syllogism with the major premise that the Act and lease required only the continuation of previous collective bargaining rights, and the minor premise that before the transfer the FAA had been subject to no duty to bargain over wages (or the other conditions of employment over which the authority refused to bargain, which for simplicity we telescope into the word "wages").
 
 
 19
 The Authority's minor premise is indisputably correct. Wages had been specified by statute while the employees were FAA employees. 5 U.S.C. § 5332. Accordingly, though the Federal Labor Relations Authority currently interprets "conditions of employment" subject to mandatory bargaining under 5 U.S.C. § 7102(2) as including wages,[5] these employees' wages were explicitly removed from bargaining by § 7103(a)(14)(C)'s exclusion of matters "specifically provided for by Federal statute".
 
 
 20
 The Authority's major premise is also correct in a general way. The Transfer Act provides that the Authority "shall continue all collective bargaining rights enjoyed before the date the lease takes effect by employees of the Metropolitan Washington Airports", 49 U.S.C. app. § 2454(c)(6)(D) (emphasis added), and empowers the Authority "to make and maintain agreements with employee organizations to the extent that the Federal Aviation Administration is so authorized on October 18, 1986," id. § 2456(c)(5). In addition, the Secretary is required to make arrangements to "assure, during the 50-year lease term, the continuation of all collective bargaining rights enjoyed by transferred employees retained by the Airports Authority." Id. § 2457(b)(2). The lease, closely tracking these terms, requires the Authority to adopt a code "to assure ... that the Airports Authority and all its transferring Employees, have the same rights and limitations with respect to labor agreements as the [FAA] and its Employees enjoyed on October 18, 1986". Article 14.B(1).
 
 
 21
 As was true for the right to strike, however, see pp. 299-300 above, the change in context provides an argument that real "continuation" of the prior rights requires a post-transfer adjustment. Indeed, federal-sector labor law gives some support to the union argument. In Fort Stewart Schools v. FLRA, 495 U.S. 641, 110 S.Ct. 2043, 109 L.Ed.2d 659 (1990), the Supreme Court deferred to the Federal Labor Relations Authority's conclusion that "conditions of employment" in § 7102(2) did include wages and wage-related issues, with the result that certain federal employees--ones not covered by the statutory wage schedules (and thus not affected by § 7103(a)(14)(C)'s exclusion)--were entitled to negotiate over wages. As the transferred employees are no longer subject to statutory wage schedules, the union argues, they too should now be able to bargain over wages.
 
 
 22
 As we noted in discussing the strike ban, the change of circumstances merely creates a statutory gap; this is especially true for the only period we need address today, the five years as to which the change is sharply limited by the congressional wage floor. Thus we would defer to any reasonable interpretation by the Secretary. See Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82. Unfortunately the Secretary has provided no authoritative interpretation. Walter Hobart, an FAA employee whose status is not clearly identified, stated in a letter responding to union president Jimmie Pete's inquiry that wages were not negotiable. See Letter to Jimmie Pete at 2 (Jan. 13, 1987), J.A. at 195. As we do not know who Mr. Hobart is, nor what information, parties or arguments he had before him, we can hardly treat this as an authoritative agency interpretation. Accordingly we must construe the statute and lease ourselves, realizing that as Congress did not clearly resolve the issue, in later disputes our view would have to yield to any reasonable contrary reading by the Secretary.[6]
 
 
 23
 As on the right-to-strike issue, plaintiffs initially encounter the fact that Congress was quite aware of the contextual changes that in plaintiffs' view call for an adjustment in bargaining rights; it was simultaneously enacting those changes. Their argument is also somewhat drawn in question by the exceptional precision of 49 U.S.C. app. § 2456(c)(5), which picks a specific date, October 18, 1986, to define the scope of the FAA bargaining authority inherited by the successor entity. The specificity suggests a static rather than a dynamic package of rights. It does not amount to a clear expression of intent that the rights must be fixed, however, as the looser language of the other "continuation" provisions is more open to allowing adjustments on the basis of changed context.
 
 
 24
 Moreover, the legislative history of the Act supports the defendants' argument. Senator Sarbanes, the sponsor of the amendment providing employee protection, specifically stated that the amendment was not intended to give airport employees greater rights than they had at the FAA: "It is very important to understand these workers now have certain collective bargaining rights. This amendment does not seek to expand those rights. It only seeks to assure them." 132 Cong.Rec. 7147 (1986) (emphasis added); see also id. (remarks of Senator Trible) (noting that purpose of employee protection provisions is to preserve "status quo").
 
 
 25
 Finally, Amalgamated Transit Union v. Donovan, 767 F.2d 939 (D.C.Cir.1985), which the union cites, does not point toward the outcome it favors. The relevant statute governed the grant of federal funds to mass transit systems that had shifted from private to public ownership. The statute conditioned grants on the Secretary's certifying that the transit authority had made "fair and equitable" labor protection arrangements, including "the continuation of collective bargaining requirements" in the private sector, 49 U.S.C. § 1609(c). State law prohibited the transit union from bargaining over wages. Our decision invalidating the grant clearly took a static view of the requirement, reading it to shift the bargaining duty, unchanged, despite the differences in context.
 
 
 26
 As we act here essentially as stand-ins for the Secretary--whose reasonable view on the matter would control if expressed--it is relevant to recall his predecessor's treatment of the related question of the employees' right to strike. On that issue she plainly rejected the union's contention that the changes accompanying the transfer--the shift from direct congressional setting of wage schedules to mere establishment of a five-year floor--required some sort of offsetting adjustment. See pp. 299-300 above. Further, in translating the statutory requirements into lease provisions she used a specific (and thus seemingly static) formula, that of § 2456(c)(5), to define the "rights and limitations" transferred, referring to those "enjoyed on October 18, 1986". See Article 14.B(1). Thus it seems highly probable that the Secretary would--at least for the first five years, the only period in question here--take the view that genuine "continuation" of the employees' collective bargaining rights did not require any expansion in pre-existing rights.
 
 
 27
 Accordingly, we find no violation of the lease or statute in the Authority's refusal to bargain over the previously non-bargainable issues.
 
 
 28
 As Congress has for the first five years supplied only a floor (not a complete wage schedule such as governed the employees while they worked for the FAA), nothing in the statute prevents wage increases even during that period. Here we say only that the Act did not prescribe collective bargaining as a means by which any such increases might occur; no one has pointed us to any provision that would rule out either individual bargains or voluntary collective bargaining.
 
 B. Sick and Annual Leave Accrual
 
 29
 The day after the lease took effect, the Authority reduced the firefighters' work week from 72 to 56 hours, and, accordingly, decreased the weekly accrual of annual and sick leave to reflect the lower number of hours worked. The firefighters' salaries were not reduced, however.[7] They now earn as much for working 56 hours as they previously earned for 72 hours--a windfall they do not challenge. Yet they insist they are entitled to accrue leave as if they still worked 72 hours. The union contends that by reducing the weekly leave accrual, the Authority violated the Transfer Act's requirement that "[d]uring the 5year period beginning [when the lease takes effect] annual and sick leave shall be earned at the same rates permitted on the day before" the transfer. 49 U.S.C. app. § 2457(d) (emphasis added).
 
 
 30
 As the firefighters are still earning leave at the same basic hourly rate as before, the union's argument turns entirely on the assumption that the "rate" referred to in the statute must have been a weekly rate. While one can imagine a fixed weekly rate, in fact the leave accrual schedules governing the employees while working for the FAA in substance expressed hourly rates, providing completely proportional accrual rates for 56-, 72- and 84-hour work weeks.[8] See General Provisions for Annual and Sick Leave, FPM Supp. 990-2, Subchapter S2, U.S. Civil Service Commission (1969), J.A. at 380, 387; Department of Transportation, Federal Aviation Administration Order 3600.4 p 12, J.A. at 392, 394. Thus the authority has in fact retained the prior rate, and the decrease in amounts accrued is perfectly consistent with § 2457(d).[9]
 
 C. Labor Code provisions
 
 31
 In the spring of 1988 the Authority began developing a labor code. Following public comment and a hearing, the Authority's Board of Directors approved a draft and submitted it to the Authority's Board of Review, which allowed the 30-day disapproval period to lapse, see 49 U.S.C. app. § 2456(f)(4)(D), letting the code take effect as scheduled on February 1, 1989.
 
 
 32
 Appellants first attack the labor code, as they attacked the lease provisions, for carrying pre-transfer limitations on bargaining rights over into the post-transfer situation; this requires no further discussion. They also attack its validity generally in light of the invalidation of the Board of Review by this court and the Supreme Court, see Metropolitan Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc., --- U.S. ----, 111 S.Ct. 2298, 115 L.Ed.2d 236 (1991); they contend that the code language implementing the lease's strike ban is overbroad, in violation of the First Amendment; and they raise a few miscellaneous objections.
 
 
 33
 Invalidation of the Board of Review: The Transfer Act requires that Airports Authority regulations be submitted to a nine-member Board of Review, which has 30 days to veto them; if the Board of Review takes no action, the regulations go into effect, as the labor code did here. See 49 U.S.C. app. § 2456(f). The Supreme Court held in Metropolitan Washington Airports Authority that the Board of Review violates the constitutional principle of separation of powers. The union argues that the Supreme Court's decision should be applied retroactively to invalidate all Authority actions that were submitted to the Board of Review.
 
 
 34
 Although the Supreme Court failed to address the retroactive effect of its decision, we had directed in our opinion below that "actions taken by the Board to this date not be invalidated automatically on the basis of our decision", Citizens for the Abatement of Aircraft Noise, Inc. v. Metropolitan Washington Airports Authority, 917 F.2d 48, 57-58 (D.C.Cir.1990), aff'd, --- U.S. ----, 111 S.Ct. 2298, 115 L.Ed.2d 236 (1991). As the Supreme Court, in affirming our decision, did not mention this aspect, we see no reason to think it intended to reverse us on the point. See also Action Alliance of Senior Citizens v. Sullivan, 930 F.2d 77, 83-84 (D.C.Cir.1991) (where circuit court decision is vacated for reconsideration, rulings on unrelated issues continue to have precedential effect).[10] Further, in other cases invalidating governmental bodies, the Supreme Court has not applied its rulings to strike down the entities' prior acts. See, e.g.,Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 87-88, 102 S.Ct. 2858, 2880, 73 L.Ed.2d 598 (1982) (invalidation of jurisdictional grant to non-Article III bankruptcy courts applied prospectively); Buckley v. Valeo, 424 U.S. 1, 142, 96 S.Ct. 612, 693, 46 L.Ed.2d 659 (1976) (invalidation of certain Federal Election Commission powers not to affect past exercise of those powers); Cipriano v. City of Houma, 395 U.S. 701, 706, 89 S.Ct. 1897, 1900, 23 L.Ed.2d 647 (1969) (invalidation of bond approval election procedure not to affect validity of bonds previously issued and authorized).[11]
 
 
 35
 Overbreadth of "strike" definition: In seeking to implement the lease's continuation of the pre-existing ban on strikes, the Authority defined strikes as follows:
 
 
 36
 Strike means the concerted cessation, stoppage, or slow down of work, failure to report for duty, abstinence in whole or in part from the full, faithful and proper performance of the duties of employment, or any other concerted interference, coercive or otherwise, with the operation of the MWAA, for the purpose of inducing, influencing, or coercing a change in the conditions of compensation or the rights, privileges or obligations of employment.
 
 
 37
 MWAA Labor Code § 2(o), J.A. at 340-41.
 
 
 38
 The union argues that this definition is so broad that it could be applied to speech protected by the First Amendment, such as peaceful leafletting. Cf. Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council, 485 U.S. 568, 575-76, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988) (construing statute prohibiting certain types of secondary strike activity not to cover peaceful handbilling to avoid serious First Amendment problems). Indeed, the definition appears to be broader than the language used in other statutes, such as 29 U.S.C. § 142(2), which defines strike as including "any strike or other concerted stoppage of work by employees ... and any concerted slowdown or other concerted interruption of operations by employees".
 
 
 39
 But the overbreadth doctrine may not be invoked to strike down any provision that might reach protected speech in some imaginable application. To invalidate a statute on its face, the overbreadth "must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." Broadrick v. Oklahoma, 413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973) (emphasis added); see also New York v. Ferber, 458 U.S. 747, 771, 102 S.Ct. 3348, 3362, 73 L.Ed.2d 1113 (1982) ("a law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications").
 
 
 40
 Section 2(o) of the labor code appears primarily directed at regulable labor conduct, such as ordinary strikes and slowdowns, which may have expressive elements but are clearly subject to government regulation. Cf. International Brotherhood of Teamsters v. Vogt, Inc., 354 U.S. 284, 291-93, 77 S.Ct. 1166, 1170-71, 1 L.Ed.2d 1347 (1957) (First Amendment permits regulation of labor picketing aimed at frustrating legitimate state policies). Moreover, portions of the labor code itself suggest that § 2(o) was not intended to cover protected speech. Section 12(c), for example, provides:
 
 
 41
 The expressing of any views, arguments, or opinions, or the dissemination thereof, whether in written, printed, graphics, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Subtitle, if such expression contains no threat of reprisal or force or promise of benefit, or misrepresentation of fact.[12]
 
 
 42
 At worst, § 2(o) is similar to other provisions that the Supreme Court has refused to assess for some marginal overbreadth, in that "the 'remainder of the statute ... covers a whole range of easily identifiable and constitutionally ... proscribable conduct....' " Parker v. Levy, 417 U.S. 733, 760, 94 S.Ct. 2547, 2563, 41 L.Ed.2d 439 (1974) (quoting United States Civil Service Commission v. National Ass'n of Letter Carriers, 413 U.S. 548, 580-81, 93 S.Ct. 2880, 2898, 37 L.Ed.2d 796 (1973)).
 
 
 43
 The judicial reluctance to reach overbreadth claims appears especially high in cases such as this, where the provision has never been applied to any conduct. Overbreadth is usually invoked by persons against whom a statute has been constitutionally applied, to "challenge that statute on the ground that it may conceivably be applied unconstitutionally to others," Broadrick v. Oklahoma, 413 U.S. at 610, 93 S.Ct. at 2915. Here by contrast, the no-strike provision has never been litigated, either by the arbitration panel[13] in adjudicating an unfair labor practice claim or by the Virginia courts to enforce the panel's order. Either body is likely to read § 2(o) so as to exclude any burden on protected activities. In Board of Trustees v. Fox, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989), the Court cautioned against extensions of "overbreadth doctrine from a necessary means of vindicating the plaintiff's own right not to be bound by a statute that is unconstitutional into a means of mounting gratuitous wholesale attacks upon state and federal laws", attacks whose resolution would require "consideration of many more applications than those immediately before the court." Id. at 485, 109 S.Ct. at 3037; see also National Treasury Employees Union v. Kurtz, 600 F.2d 984, 989 (D.C.Cir.1979). Although overbreadth claims may sometimes be resolved even before the court makes any assessment of the provision as applied, as in Board of Airport Commissioners v. Jews for Jesus, Inc., 482 U.S. 569, 571, 107 S.Ct. 2568, 2570, 96 L.Ed.2d 500 (1987), there the statute was clearly substantially overbroad, because it banned all "First Amendment activities" in the Los Angeles Airport, and the Court did not think it susceptible of a narrowing construction. See 482 U.S. at 575-76, 107 S.Ct. at 2572-73. Section 2(o) is not nearly so broad, as it refers mainly to traditional strikes, work stoppages, and similar concerted action. Accordingly, we do not address the possibly unconstitutional readings of the strike ban.
 
 
 44
 We further note our doubts whether, in the absence of some threat that the Authority may seek to apply § 2(o) to plaintiffs' protected speech, they even have standing to raise the claim. Cf. Laird v. Tatum, 408 U.S. 1, 14, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972). As Judge Bazelon wrote in National Student Ass'n, Inc. v. Hershey, 412 F.2d 1103 (D.C.Cir.1969), "[W]e are not persuaded that every plaintiff who alleges a First Amendment chilling effect and shivers in court has thereby established a case or controversy." Id. at 1113-14. See also United Presbyterian Church v. Reagan, 738 F.2d 1375, 1378-80 (D.C.Cir.1984) (pointing out that Supreme Court cases relying upon "chilling effect" cite it as the reason to invalidate a statute, not as the harm that entitles the plaintiff to challenge it) (Scalia, J.); American Library Ass'n v. Barr, 956 F.2d 1178, 1193 (D.C.Cir.1992).
 
 
 45
 Miscellaneous: Plaintiffs point to an array of labor code provisions, such as § 12's ban on unfair labor practices, and contend that they are inconsistent with the Transfer Act. See Petitioners' Brief at 46-48, 51. All of these claims either depend on plaintiffs' notion that in transferring rights the Act somehow redefined them so as to remove all their pre-existing limitations or on a complete disregard of the reality of pre-existing law. None has merit.
 
 
 46
 Finally, we agree with the district court that the question whether jurisdiction over representation and unfair labor practice matters properly lies in Virginia courts is not yet ripe for decision. See Federal Firefighters Ass'n II, 723 F.Supp. at 827. Section 7(e) of the Labor Code, cited by the union, does not even specify which courts shall have jurisdiction over legal challenges to representation decisions; it merely provides that "[d]ecisions of the Panel on Representation Matters shall not be subject to court review, except with respect to unit determinations that are alleged to be contrary to law". As to § 13(e) of the Code, it authorizes a complaining party to petition the Virginia courts for enforcement of unfair labor practice decisions by the Authority's arbitration panel; it is unclear whether there are any circumstances under which this clause would have any effect. Cf. Federal Firefighters Ass'n II, 723 F.Supp. at 827 (noting that the Authority's assertion alone could not oust a federal court of otherwise available jurisdiction).
 
 
 47
 Accordingly, we affirm the judgment of the district court in all respects.
 
 
 48
 So ordered.
 
 
 
 [1]
 The court also invalidated a provision of the labor code that established a dispute resolution procedure. See Federal Firefighters Ass'n II at 827. The defendants do not appeal this ruling, however, so the issue is not before us
 
 
 [2]
 49 U.S.C. app. § 2454(e) provides:
 The district courts of the United States shall have jurisdiction to compel the Airports Authority and its officers and employees to comply with the terms of the lease. An action may be brought on behalf of the United States by the Attorney General, or by any aggrieved party.
 (Emphasis added.)
 
 
 [3]
 We note that the Virginia and D.C. statutes creating the Authority also outlaw strikes by airport employees. See 1987 Va.Acts ch. 665, § 5(A)(10); D.C. Regional Airports Authority Act of 1985 Amendment Act of 1987, D.C.Law 7-18, § 3(c)(3). As neither has been enforced, and the union does not allege any imminent threat of enforcement, its challenge of the statutes is unripe
 
 
 [4]
 Specifically, the Act requires provisions
 (5) for an offering of not less than ... three health insurance programs for transferred employees retained by the Airports Authority during the 5-year period beginning on the date the lease takes effect which are reasonably comparable with respect to employee premium cost and coverage to the Federal health ... insurance programs available to employees on the day before [the lease takes effect].
 49 U.S.C. app. § 2457(a)(5).
 
 
 [5]
 The Supreme Court has deferred to this interpretation. See Fort Stewart Schools v. FLRA, 495 U.S. 641, 110 S.Ct. 2043, 2045-49, 109 L.Ed.2d 659 (1990)
 
 
 [6]
 The Authority is of course directly bound by the lease. We do not address the issue that would be posed if the Authority objected to an otherwise lawful interpretation by the Secretary on the ground that (somehow) the lease embodied a different construction
 
 
 [7]
 In fact, it appears that the firefighters' salaries were increased and are now higher than those of comparable federal employees working 72 hours per week. See Second Affidavit of Walter B. Hobart, Jr. p 5 (Jan. 9, 1989), J.A. at 378
 
 
 [8]
 Trivial differences of .8% and 1% for accrual codes 4 and 6, respectively, see Department of Transportation, Federal Aviation Administration Order 3600.4 p 12(c)(2) (chart), J.A. at 394, are clearly attributable to a desire to use round numbers and do not undermine our analysis here
 
 
 [9]
 The union's claim that the Authority must bargain over the change in leave accrual is also unfounded, because leave accrual is determined by regulation and thus is not a mandatory subject of bargaining. See 5 U.S.C. § 7117 (no right to bargain over issues controlled by Government-wide regulation)
 
 
 [10]
 After remand by the Supreme Court the district court enjoined the Board of Review from exercising its powers prospectively from the date of the Supreme Court's decision, June 17, 1991. See Citizens for the Abatement of Aircraft Noise, Inc. v. Metropolitan Washington Airports Authority, Civ. No. 88-3319, Order at 2-3, 1991 WL 166600 (D.D.C. Aug. 5, 1991)
 
 
 [11]
 James B. Beam Distilling Co. v. Georgia, --- U.S. ----, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991) (plurality opinion), does not undermine our analysis because a majority of the justices either refused to "speculate" on the continuing vitality of "pure prospectivity", id. at 2448 (Souter, J., joined by Stevens, J.), or explicitly endorsed the concept, id. at 2449 (White, J., concurring in the judgment); id. at 2451 (O'Connor, J., dissenting, joined by Rehnquist, C.J., and Kennedy, J.)
 
 
 [12]
 Section 12 does not completely resolve the issue, however. It refers only to unfair labor practices, while other provisions implicate § 2(o)'s definition, such as § 15(b) (prohibiting persons who "participate[ ] in a strike against MWAA" from accepting or holding positions in MWAA)
 
 
 [13]
 Section 4 of the labor code provided for an arbitration panel composed of members chosen by the Authority, and the district court held that the selection method did not reasonably replicate the pre-transfer dispute resolution mechanisms. See Federal Firefighters' Ass'n II, 723 F.Supp. at 827. The district court directed the parties to submit a proposed order providing for transition to an independent, bipartisan dispute resolution panel, id., and subsequently issued an order with that effect. See Order (D.D.C. Oct. 30, 1989)