# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 16, 2007          Decided July 13, 2007

No. 06-1005

CEMENT KILN RECYCLING COALITION,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY AND
STEPHEN L. JOHNSON, ADMINISTRATOR OF THE UNITED
STATES ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENTS

---

On Petition for Review of an Order of the
Environmental Protection Agency

---

*Richard G. Stoll, Jr.* argued the cause for petitioner. With him on the briefs was *Katherine E. Lazarski*.

*David J. Kaplan*, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the brief were *John C. Cruden*, Deputy Assistant Attorney General, and *Laurel Celeste*, Counsel, U.S. Environmental Protection Agency. *Cynthia J. Morris*, Attorney, U.S. Department of Justice, entered an appearance.

Before: HENDERSON, RANDOLPH, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*:  The Cement Kiln Recycling Coalition petitions for review of an Environmental Protection Agency regulation that governs the permitting process for facilities that burn hazardous waste as fuel.  The Coalition also petitions for review of a guidance document, the Human Health Risk Assessment Protocol, that pertains to the same permitting process.  For the reasons stated below, we deny the petition for review insofar as it challenges the regulation, and we dismiss the challenge to the guidance document as outside our jurisdiction.

I

Hazardous waste combustors (HWCs) are facilities -- such as incinerators, boilers, and industrial furnaces (including cement kilns) -- that burn hazardous waste as fuel for their operations.  The Cement Kiln Recycling Coalition, the petitioner in this case, is a trade association that includes manufacturers of Portland cement that utilize hazardous waste as an alternative fuel in some of their kilns.  The Environmental Protection Agency (EPA) has authority to regulate this activity under both the Resource Conservation and Recovery Act (RCRA), *see* 42 U.S.C. § 6924, and the Clean Air Act (CAA), *see id.* § 7412.

Subtitle C of RCRA, *see* 42 U.S.C. § 6921 *et seq.*, "establishes a 'cradle to grave' federal regulatory system for the treatment, storage, and disposal of hazardous wastes." *American Portland Cement Alliance v. EPA*, 101 F.3d 772, 774 (D.C. Cir. 1996) (quoting *Chemical Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 337 n.1 (1992)).  This system operates through a combination of national standards established by EPA regulations, and a permit program in which permitting authorities -- either EPA or states that have hazardous waste

programs authorized by the agency -- apply those national standards to particular facilities. *See* 42 U.S.C. §§ 6924-26.

The national standards applicable to the petitioner are authorized by RCRA § 3004, 42 U.S.C. § 6924, which governs "owners and operators of facilities for the treatment, storage, or disposal of hazardous waste," known as TSDs. 42 U.S.C. § 6924(a). For RCRA purposes, the burning of hazardous waste is considered "treatment," and thus falls within the statute. *Id.* § 6903(34); *see Horsehead Res. Dev. Co. v. Browner*, 16 F.3d 1246, 1252 & n.2 (D.C. Cir. 1994). Section 3004(a), which applies generally to all TSDs, directs EPA to "promulgate regulations establishing such performance standards, applicable to [TSDs], as may be necessary to protect human health and the environment." 42 U.S.C. § 6924(a). Section 3004(q) specifically applies to facilities that burn hazardous waste as fuel, including cement kilns and other types of HWCs. *Id.* § 6924(q)(1)(B). Like section 3004(a), this section directs EPA to promulgate such standards "as may be necessary to protect human health and the environment." *Id.* § 6924(q)(1).

In addition to the national standards authorized by section 3004, section 3005 of RCRA, 42 U.S.C. § 6925, establishes a case-by-case permitting process. Section 3005(a) directs EPA to "promulgate regulations requiring each person owning or operating an existing [TSD] or planning to construct a new [TSD] to have a permit issued pursuant to this section." *Id.* § 6925(a). Section 3005(b) mandates that "[e]ach application for a permit under this section shall contain such information as may be required under regulations promulgated by [EPA]." *Id.* § 6925(b). And section 3005(c)(3) -- which EPA refers to as the "omnibus" provision -- provides that "[e]ach permit issued under this section shall contain such terms and conditions as the [permitting authority] determines necessary to protect human health and the environment." *Id.* § 6925(c)(3).

Although RCRA gives EPA comprehensive authority to regulate hazardous waste combustors, the fact that HWCs emit air pollutants also gives the agency jurisdiction under the Clean Air Act, 42 U.S.C. § 7401 *et seq.* Section 112 of the CAA, as amended in 1990, directs EPA to issue national emission standards for hazardous air pollutants. *See id.* § 7412. The statute requires EPA to "promulgate technology-based emission standards for categories of sources that emit [such pollutants]. These emission standards are to be based not on an assessment of the risks posed by [hazardous air pollutants], but instead on the maximum achievable control technology (MACT) for sources in each category." *Sierra Club v. EPA*, 353 F.3d 976, 980 (D.C. Cir. 2004) (citations omitted); *see* 42 U.S.C. § 7412(d).[1] Thus, EPA's jurisdiction under RCRA § 3004 and § 3005 overlaps with its jurisdiction under CAA § 112 when the source of hazardous air pollutants is also a TSD.

Anticipating that EPA's jurisdiction under RCRA would overlap with its jurisdiction under other statutes, Congress enacted RCRA § 1006(b), 42 U.S.C. § 6905(b). This provision requires EPA to "integrate all provisions of [RCRA] for purposes of administration and enforcement and shall avoid duplication, to the maximum extent practicable, with the appropriate provisions of[, inter alia,] the Clean Air Act." *Id.* § 6905(b)(1).

In 1991, EPA promulgated RCRA regulations applicable to boilers and industrial furnaces (including cement kilns) that treat hazardous waste by burning it as fuel. *See* Burning of

---

[1]Within eight years after EPA promulgates MACT standards, the statute "returns to a risk-based analysis . . . , [and] requires EPA to consider whether residual risks remain that warrant more stringent standards than achieved through MACT." *Sierra Club*, 353 F.3d at 980; *see* 42 U.S.C. § 7412(f).

5

Hazardous Waste in Boilers and Industrial Furnaces, 56 Fed. Reg. 7,134 (Feb. 21, 1991). The 1991 RCRA rule was "principally designed to establish air emissions requirements" pursuant to RCRA § 3004(q). *Horsehead*, 16 F.3d at 1251.

Beginning in 1994, EPA began requiring every HWC that applied for a RCRA permit to undergo a site-specific risk assessment (SSRA). *See* Strategy for Hazardous Waste Minimization and Combustion (1994), *available at* http://www.epa.gov/epaoswer/hazwaste/combust/general/strat -2.txt. EPA intended the SSRA program to give permitting authorities the ability to impose permit conditions beyond national standards in order "to limit emissions on a case-by-case basis as necessary to ensure protection of human health and the environment." *Id*. A human-health SSRA could include a "direct exposure" assessment designed to predict the health impact of breathing air in the vicinity of a facility; it could also include an "indirect" exposure assessment designed to focus on multi-pathway non-inhalation exposures, such as the consumption of crops grown in soil upon which substances emitted into the air are deposited. EPA did not enshrine the SSRA program in specific regulations, maintaining that authority was provided by RCRA's "omnibus" provision, RCRA § 3005(c)(3). EPA did, however, issue guidance documents to assist permitting authorities in conducting SSRAs.

In 1999, pursuant to the Clean Air Act, EPA promulgated technology-based MACT standards to control hazardous pollutants emitted by facilities that burn hazardous waste, including incinerators and cement kilns. *See* Final Standards for Hazardous Air Pollutants for Hazardous Waste Combustors, 64 Fed. Reg. 52,828 (Sept. 30, 1999). This court vacated those standards in 2001, holding that EPA had not adequately demonstrated that they satisfied the requirements of CAA §

112(d). *See Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 857 (D.C. Cir. 2001).

In 2005, following notice and comment, EPA promulgated revised MACT standards for HWCs. *See* National Emission Standards for Hazardous Air Pollutants:  Final Standards for Hazardous Air Pollutants for Hazardous Waste Combustors, 70 Fed. Reg. 59,402 (Oct. 12, 2005) ("Final Rule").  At the same time, EPA announced that the 1991 RCRA standards would "no longer apply once a facility demonstrates compliance with" the relevant 2005 MACT standards. *Id.* at 59,523.  EPA issued this "deferral" announcement pursuant to RCRA's integration provision, 42 U.S.C. § 6905(b), and the agency's finding that the new Clean Air Act MACT standards were generally "protective of human health and the environment," as required by RCRA. *See* Final Rule, 70 Fed. Reg. at 59,517, 59,536.  Concluding, however, that "there may be instances where [the agency] cannot assure that emissions from each source will be protective of human health and the environment," *id.* at 59,504, EPA issued regulations that authorize permitting authorities to conduct SSRAs on a case-by-case basis, *see* 40 C.F.R. §§ 270.10(*l*), 270.32(b)(3).[2]

Those regulations, and particularly 40 C.F.R. § 270.10(*l*), which is set out in full in the appendix to this opinion, are the focus of the petition that is now before us.  Section 270.10(*l*) expressly authorizes a permitting authority to conduct an SSRA -- that is, to "require the additional information or assessment(s)

_____

[2]As noted above, EPA had historically relied solely on RCRA's "omnibus" provision, RCRA § 3005(c)(3), as authority for its SSRA program. *See* Final Rule, 70 Fed. Reg. at 59,506.  Although EPA continued to maintain that the "omnibus" provision was sufficient, the Final Rule codified the program in regulations issued pursuant to RCRA § 3004(a), § 3004(q), and § 3005(b). *See id.*

necessary to determine whether additional controls are necessary to ensure protection of human health and the environment." *Id.* § 270.10(*l*). "This includes information necessary to evaluate the potential risk to human health and/or the environment resulting from both direct and indirect exposure pathways." *Id.* A permitting authority may require an SSRA only if it "concludes, based on one or more of the factors listed in paragraph (*l*)(1) of [the regulation,] that compliance with the [MACT standards] alone may not be protective of human health or the environment." *Id.* Finally, a companion regulation provides that, if the permitting authority "determines that conditions are necessary in addition to those required [by the MACT standards] to ensure protection of human health and the environment, [it] shall include those terms and conditions in a RCRA permit for a hazardous waste combustion unit." *Id.* § 270.32(b)(3).

Although the 2005 Final Rule expressly authorized the SSRA program by regulation, EPA declined to promulgate regulations defining how SSRAs must be conducted. EPA explained that "risk assessment -- especially multi-pathway, indirect exposure assessment -- is a highly technical and evolving field," and that "[a]ny regulatory approach [it] might codify in this area is likely to become outdated, or at least artificially constraining, shortly after promulgation in ways that [it] cannot anticipate now." Final Rule, 70 Fed. Reg. at 59,512. Instead, EPA issued a revised guidance document, the Human Health Risk Assessment Protocol for Hazardous Waste Combustion Facilities (HHRAP), containing technical recommendations "for conducting multi-pathway, site-specific human health risk assessments on" HWCs. HHRAP at 1-1 (Joint Appendix (J.A.) 453); *see* Final Rule, 70 Fed. Reg. at 59,512-13.

The Coalition now petitions for review pursuant to RCRA § 7006(a)(1), 42 U.S.C. § 6976(a)(1), which gives this court exclusive jurisdiction over "petition[s] for review of action of the [EPA] in promulgating any regulation, or requirement under [RCRA]." *Id.* § 6976(a)(1). The Coalition raises several substantive and procedural challenges to the validity of 40 C.F.R. § 270.10(*l*). It also challenges the HHRAP guidance document as a de facto legislative rule that was not promulgated through notice-and-comment rulemaking, in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 553. EPA responds that the Coalition's petition is not ripe for review and, in the alternative, defends its actions on a number of other grounds. We consider the ripeness question in Part II, the Coalition's challenge to the regulation in Part III, and its challenge to the guidance document in Part IV.

II

The "basic rationale" of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967); *see Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732-33 (1998). "Determining whether administrative action is ripe for judicial review requires us to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *National Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (citing *Abbott Labs.*, 387 U.S. at 149).

EPA contends that neither the Coalition's challenge to § 270.10(*l*), nor its challenge to the HHRAP guidance document, is ripe for review. We disagree on both counts.

A

The Coalition objects to § 270.10(*l*) on three grounds. According to the petitioner, the regulation is: (1) contrary to RCRA § 3005(b) -- which directs that RCRA permit applications "shall contain such information as may be required under regulations promulgated by" EPA, 42 U.S.C. § 6925(b) -- because it does not spell out the information that will be required in a permit application; (2) contrary to RCRA, because it fails to define with sufficient specificity when an SSRA will be required, and under what circumstances a permit will be granted or denied; and (3) in violation of the APA, because EPA failed to provide notice and an opportunity to comment regarding the rationale for subjecting only HWCs (and not other TSDs) to the SSRA program, and arbitrarily failed to respond to industry comments on the same topic.

"In determining the fitness of an issue for judicial review we look to see whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Clean Air Implementation Project (CAIP) v. EPA*, 150 F.3d 1200, 1204 (D.C. Cir. 1998) (internal quotation marks omitted). We have further "observed that a purely legal claim in the context of a facial challenge . . . is 'presumptively reviewable.'" *National Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir. 2005) (quoting *National Mining Ass'n v. Fowler*, 324 F.3d 752, 757 (D.C. Cir. 2003)).

All of the Coalition's challenges are to the facial validity of § 270.10(*l*), and all are "purely legal." It is well-established that

"'[c]laims that an agency's action is arbitrary and capricious or contrary to law present purely legal issues.'" *National Ass'n of Home Builders*, 417 F.3d at 1282 (quoting *Atlantic States Legal Found., Inc. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003)). So, too, do claims that an agency violated the APA by failing to provide notice and opportunity for comment. *See Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 92 (D.C. Cir. 1986). To be sure, "we have cautioned that sometimes 'even purely legal issues may be unfit for review.'" *National Ass'n of Home Builders*, 417 F.3d at 1282 (quoting *Atlantic States Legal Found.*, 325 F.3d at 284). But EPA has offered no argument to overcome the presumption that these purely legal issues are fit for judicial decision. Because the issues are "purely legal," because the Coalition's facial challenge would not "benefit from a more concrete setting," and because EPA's action is unquestionably "final," the Coalition's challenge to § 270.10(*l*) is fit for judicial review. *CAIP*, 150 F.3d at 1204.

EPA further contends that, even if the issues are fit for review, the Coalition cannot show that it would suffer hardship if we deferred judgment. But "[w]here the first prong of the . . . ripeness test is met and Congress has emphatically declared a preference for immediate review[,] . . . no purpose is served by proceeding to the [hardship] prong." *General Elec. Co. v. EPA*, 290 F.3d 377, 381 (D.C. Cir. 2002) (internal quotation marks omitted). Here, Congress has declared a preference for immediate review by providing that a challenge to a final RCRA regulation must be brought within ninety days of promulgation. *See* 42 U.S.C. § 6976(a)(1); *see also Molycorp, Inc. v. EPA*, 197

11

F.3d 543, 547 (D.C. Cir. 1999).[3]  We therefore hold that the Coalition's challenge to § 270.10(*l*) is ripe for review.

B

The Coalition objects to the HHRAP guidance document solely on the ground that it is effectively a binding legislative rule, and that it therefore should have been -- but was not -- promulgated pursuant to the APA's notice-and-comment requirements.  *See* 5 U.S.C. § 553(b), (c).  As we discuss more fully in Part IV below, the question of whether the guidance document is a legislative rule that is subject to notice and comment -- rather than a policy statement that is not -- turns on "whether the agency action binds private parties or the agency itself with the 'force of law.'" *General Elec.*, 290 F.3d at 382. (As we also explain in Part IV, whether we have jurisdiction to rule on the Coalition's challenge turns on a similar inquiry.[4]) An "agency pronouncement will be considered binding as a practical matter," we have explained, "if it either [1] appears on its face to be binding, or [2] is applied by the agency in a way that indicates it is binding." *Id.* at 383 (citation omitted).

---

[3]*Cf. Ohio Forestry*, 523 U.S. at 737 (finding that a challenge to a Forest Service management plan was unripe, in part because "Congress has not provided for preimplementation judicial review of forest plans" under the National Forest Management Act, in contrast to other statutes, like RCRA § 7006, under which "Congress has specifically instructed the courts to review 'preenforcement'").

[4]Although we must decide threshold questions before reaching the merits, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998), we may consider whether a case is ripe before determining whether there is subject-matter jurisdiction, *see Toca Producers v. FERC*, 411 F.3d 262, 265 n.* (D.C. Cir. 2005).

12

We have held that when a challenge to an agency document as a "legislative rule is largely a legal, not a factual, question" -- that is, when it turns only on whether the document "on its face . . . purports to bind both applicants and the Agency with the force of law" -- the claim is fit for review. *See id.* at 380. However, "[w]here we believed the agency's practical application of a statement would be important, we have found the issue not" fit for judicial determination. *Public Citizen, Inc. v. Nuclear Regulatory Comm'n*, 940 F.2d 679, 683 (D.C. Cir. 1991).[5] Thus, whether the Coalition's challenge to the HHRAP guidance document is fit for review turns in significant part on whether that challenge can be resolved on the face of the document, or whether it depends as well on the way in which the document will be applied.

EPA contends that the petition is unripe because the Coalition "relies upon its own speculation that permitting authorities will treat the Guidance as if it were legally binding and that the Guidance will impose new and significant burdens." EPA Br. 26. The Coalition, however, disclaims any intent to rely on how the guidance has been or will be applied to particular facilities, declaring that its challenge is based solely on "the words of the statute, the words of EPA's regulations, the guidance documents, and the case law." Coalition Reply Br. 6. Indeed, the petitioner insists that its challenge "does not involve

---

[5]*See General Motors Corp. v. EPA*, 363 F.3d 442, 451 (D.C. Cir. 2004) (holding that, "to the extent [the] petition challenges the application of EPA's regulatory interpretation to [petitioner's] plants, the challenge is unripe"); *Hudson v. FAA*, 192 F.3d 1031, 1034-35 (D.C. Cir. 1999) ("[W]e have often held that an early procedural challenge to a purported policy statement [on the ground that it is actually a legislative rule] is not ripe because it is not yet demonstrable that the agency intends to treat it as having the characteristics of a rule.").

any prediction of how EPA will actually implement this regulatory regime," *id.* at 2, and "can be fully evaluated without waiting for [a particular HWC] project to arise," *id.* at 7.

Thus framed, the Coalition has limited its attack on the HHRAP to purely legal issues. As we note in Part IV, this creates a significant obstacle to the success of the Coalition's challenge. But it also renders it fit for review. *See, e.g.*, *General Elec.*, 290 F.3d at 380 (finding that a challenge to a guidance document was fit for review because it "turn[ed] . . . primarily upon the text of the Document"). And as we discussed in Part II.A, that ends our ripeness analysis. We do not proceed to the hardship prong when the issue is adjudged fit for judicial determination and Congress has provided for immediate review. If the Coalition is correct on the merits -- that is, if the HHRAP is a final legislative rule -- then Congress has so provided here. *See* 42 U.S.C. § 6976(a)(1). We therefore conclude that the Coalition's challenge to the guidance document -- like its challenge to § 270.10(*l*) -- is ripe for review.

III

As noted in Part II, the Coalition objects to § 270.10(*l*) on three grounds. RCRA requires us to review those objections under the standard set forth in the APA. *See* 42 U.S.C. § 6976(a) (citing 5 U.S.C. §§ 701-706). As relevant here, we may overturn the regulation only if we find that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or that it was promulgated "without observance of procedure required by law," *id.* § 706(2)(D).

14

A

The Coalition's first objection is that § 270.10(*l*) is "not in accordance with law" because it fails to spell out the information that is required in a permit application. RCRA § 3005(b) directs that "[e]ach application for a permit under [section 3005] shall contain such information as may be required *under regulations* promulgated by" EPA. 42 U.S.C. § 6925(b) (emphasis added). In the Coalition's view, § 270.10(*l*) does not satisfy this statutory directive because the regulation does not "specify[] [the] information to be submitted in a RCRA permit application under [EPA's] SSRA program." Coalition Br. 21. That information, the Coalition maintains, is specified only in the HHRAP guidance document.

The Coalition's contention relies on our decisions in *MST Express v. Department of Transportation*, 108 F.3d 401 (D.C. Cir. 1997), and *Ethyl Corp. v. EPA*, 306 F.3d 1144 (D.C. Cir. 2002). The challenge in *MST Express* was based on the Motor Carrier Safety Act, which directed the Secretary of Transportation to "'*prescribe regulations* establishing a procedure to decide on the safety fitness of owners and operators of commercial motor vehicles,'" including "'a means of deciding whether the owners, operators, and persons meet the safety fitness requirements under'" the statute. *MST Express*, 108 F.3d at 402 (emphasis added) (quoting 49 U.S.C. § 31144(a)(1) (1997)). We concluded that the Department had not carried out its statutory obligation because its regulations wholly failed to "set[] forth 'a means of deciding whether the owners, operators, and persons meet the safety fitness requirements.'" *Id.* at 406.

In *Ethyl Corp.*, the petitioner challenged a regulation promulgated under CAA § 206, 42 U.S.C. § 7525, which "charges [EPA] with testing new motor vehicles to ensure that

each vehicle's emissions will comply with federal emissions standards throughout its 'useful life.'" 306 F.3d at 1146 (quoting 42 U.S.C. § 7525(a)(1)). Subsection 206(d) states that EPA "shall *by regulation* establish methods and procedures for making tests under this section." *Id.* (emphasis in original) (quoting 42 U.S.C. § 7525(d)). The challenged regulation, however, did not "set out 'methods and procedures for making tests.' Rather, it establishe[d] a framework for automobile manufacturers to develop their own tests." *Id.* Relying on *MST Express*, we held that EPA had violated its statutory mandate to issue test procedures "by regulation." *See id.* at 1149-50.

We acknowledged in *Ethyl Corp.* that, when Congress has "not specified the level of specificity expected of the agency, . . . the agency [is] entitled to broad deference in picking the suitable level." *Id.* at 1149 (citing *American Trucking Ass'ns v. Dep't of Transp.*, 166 F.3d 374, 379-80 (D.C. Cir. 1999), and *New Mexico v. EPA*, 114 F.3d 290, 294 (D.C. Cir. 1997)). Here, RCRA § 3005(b) does not mandate any particular level of specificity at which EPA must define the information required in permit applications, and under *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984), we must therefore defer to a reasonable EPA interpretation as to the degree of detail required. *See, e.g.*, *American Trucking*, 166 F.3d at 378 ("The *Chevron* test applies to issues of how specifically an agency must frame its regulations."); *see also Animal Legal Def. Fund, Inc. v. Glickman*, 204 F.3d 229, 235 (D.C. Cir. 2000); *New Mexico*, 114 F.3d at 293.

In *Ethyl Corp.*, however, we noted that "Ethyl's challenge [was] not that the EPA was too general in establishing test procedures by regulation, but that it didn't establish them by regulation at all." 306 F.3d at 1149. There is a dispositive difference, we said, between "promulgations of (1) vaguely articulated test procedures (which would be reviewed

deferentially under such cases as *American Trucking*) and (2) procedures for later development of tests (invalid under *MST Express*)." *Id.* at 1149-50. Finding that the challenged regulation did "not claim to have itself articulated even a vague durability test," we held that it clearly fell "on the forbidden side of the line." *Id.* at 1150; *cf. American Trucking*, 166 F.3d at 379 (noting that "the regulations condemned in *MST Express* gave no guidance at all").

Recognizing the line that we drew in *Ethyl Corp.*, the Coalition insists that its argument "is *not* that § 270.10(*l*) is 'impermissibly vague,'" but that "on its face, the regulation is incomplete." Coalition Reply Br. 13. In effect, the Coalition maintains that its argument, like Ethyl's, is "not that the EPA was too general in establishing [information requirements] by regulation, but that it didn't establish them by regulation at all." *Ethyl Corp.*, 306 F.3d at 1149. We disagree.

Section 270.10(*l*) authorizes permitting authorities, upon a finding that the MACT standards "alone may not be protective of human health or the environment," to "require the additional information or assessment(s)"

> necessary to determine whether additional controls are necessary to ensure protection of human health and the environment. This includes information necessary to evaluate the potential risk to human health and/or the environment resulting from both direct and indirect exposure pathways.

40 C.F.R. § 270.10(*l*). The regulation then directs the permitting authority to "base the evaluation of whether compliance with the [MACT standards] alone is protective of human health or the environment on factors relevant to the potential risk from a

hazardous waste combustion unit, including, as appropriate, any of the following" nine factors:

(i) Particular site-specific considerations such as proximity to receptors (such as schools, hospitals, nursing homes, day care centers, parks, community activity centers, or other potentially sensitive receptors), unique dispersion patterns, etc.;

(ii) Identities and quantities of emissions of persistent, bioaccumulative or toxic pollutants considering enforceable controls in place to limit those pollutants;

(iii) Identities and quantities of nondioxin products of incomplete combustion most likely to be emitted and to pose significant risk based on known toxicities (confirmation of which should be made through emissions testing);

(iv) Identities and quantities of other off-site sources of pollutants in proximity of the facility that significantly influence interpretation of a facility-specific risk assessment;

(v) Presence of significant ecological considerations, such as the proximity of a particularly sensitive ecological area;

(vi) Volume and types of wastes, for example wastes containing highly toxic constituents;

(vii) Other on-site sources of hazardous air pollutants that significantly influence interpretation of the risk posed by the operation of the source in question;

(viii) Adequacy of any previously conducted risk assessment, given any subsequent changes in conditions likely to affect risk; and

(ix) Such other factors as may be appropriate.

40 C.F.R. § 270.10(*l*)(1).

The Coalition's contention -- that § 270.10(*l*) does not set forth (at all) the additional information that is required of permit applicants when EPA mandates an SSRA -- is primarily based on its assumption that the only parts of § 270.10(*l*) relevant to information requirements are the six lines of the first indented quotation in the preceding paragraph. In the Coalition's view, the balance of the regulation, including the nine factors listed in § 270.10(*l*)(1), relates only to what a permitting authority should consider when deciding whether to require an SSRA in the first place.

1. Even on the Coalition's reading, it does not appear that the information required by those six lines falls on the not "establish[ed] by regulation at all" side of the boundary demarked by *Ethyl Corp.* -- rather than on the "vaguely articulated" side, as to which we owe EPA great deference. In contrast to the situation in *Ethyl Corp.*, here the agency *does* "claim to have itself articulated [at least] a vague" information requirement. *Ethyl Corp.*, 306 F.3d at 1150. Indeed, EPA claims to have articulated a reasonably narrow requirement. In that respect, EPA stresses the context in which the information at issue here may be required.

First, as the Coalition concedes, other EPA regulations specify in considerable detail information that is required in the permit applications of all TSDs, including HWCs. *See, e.g.*, 40

C.F.R. § 270.14.[6]  The issue here involves only the "additional information" that is required of an HWC if an SSRA is mandated.  40 C.F.R. § 270.10(*l*).  Such information may be required only if a permitting authority finds that "compliance with the [MACT standards] alone may not be protective of human health or the environment."  40 C.F.R. § 270.10(*l*).

Second, the Coalition also appears to concede that even the six quoted lines would be satisfactory if the application at issue were for a "waiver to a generally applicable requirement," Coalition Br. 28 (emphasis omitted), rather than for "a permit under the established rules," *id.* at 27.  Yet, as EPA points out, the SSRA program is part and parcel of what effectively *is* a waiver program.  As EPA explains in the Final Rule, it regards the SSRA program as a necessary condition for its decision to waive (in EPA's parlance, to "defer") the application of the 1991 RCRA standards and instead to rely on the MACT standards alone.  *See, e.g.*, Final Rule, 70 Fed. Reg. at 59,512.  Although EPA believes that the MACT standards (without the 1991 RCRA standards) are sufficient to protect human health and the environment in most situations, it cannot be certain that is true at all sites.  *See id.* at 59,504.  It therefore promulgated § 270.10(*l*) to authorize SSRAs where permitting authorities found that the MACT standards may not alone be sufficiently protective.

Third, the general language of § 270.10(*l*)'s information requirement is narrowed by the circumstances under which it is triggered.  Because that additional information is not required

---

[6]This information includes, for example, a "general description of the facility," 40 C.F.R. § 270.14(b)(1), a "[c]hemical and physical analysis of the hazardous waste . . . to be handled at the facility," *id.* § 270.14(b)(2), and a "topographical map" of the surrounding area, *id.* § 270.14(b)(19).

unless the permitting authority "concludes . . . that compliance with the [MACT standards] alone may not be protective of human health or the environment," 40 C.F.R. § 270.10(*l*), the information that can be required is limited to that "necessary to" make a comparison to the (quite specific) MACT standards, *id*.

2. But even if the six quoted lines would not survive analysis under *Ethyl Corp.* and *MST Express* if they stood alone, EPA contends that they do not stand alone. In contrast to the petitioner, EPA regards the nine factors listed in § 270.10(*l*)(1) as relating not only to what a permitting authority should consider in deciding whether to require an SSRA, but also as identifying the "range of considerations for which information necessary to evaluate risks could be requested." EPA Br. 30; *see* Oral Arg. Recording at 1:20:21 (stating that the nine factors listed in subsection 270.10(*l*)(1) "cabin[] the areas . . . for which site-specific risk assessment information can be requested"). Since this is EPA's interpretation of its own regulation, it "is 'controlling' unless 'plainly erroneous or inconsistent with' the regulation[]." *Long Island Care at Home, Ltd. v. Coke*, 127 S. Ct. 2339, 2349 (2007) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)) (internal quotation marks omitted).[7]

Under this deferential standard of review, we have no authority to disturb EPA's reading of the regulation. Section 270.10(*l*)(1) states that a permitting authority "shall base the

---

[7]This standard of review is appropriate even where, as here, the agency's interpretation of its regulation is set forth in its brief to this court, because we "have 'no reason . . . to suspect that [this] interpretation' is merely a '*post hoc* rationalizatio[n]' of past agency action, or that it 'does not reflect the agency's fair and considered judgment on the matter in question.'" *Long Island Care at Home, Ltd.*, 127 S. Ct. at 2349 (quoting *Auer*, 519 U.S. at 462) (internal quotation marks omitted).

evaluation of whether compliance with the [MACT standards] alone is protective of human health or the environment" on the nine listed factors. 40 C.F.R. § 270.10(*l*)(1). The petitioner is correct that this "evaluation" is central to the determination of whether to require an SSRA -- which turns on the conclusion "that compliance with the [MACT standards] alone may not be protective." *Id.* § 270.10(*l*). But it is also highly relevant to the evaluation of what "additional information" is "necessary to determine whether additional controls [beyond the MACT standards] are necessary to ensure protection" -- the only "additional information" that may be required in an SSRA. *Id.* Thus, EPA's interpretation is neither plainly erroneous nor inconsistent with the regulation, and we are bound to accept it.

Once we determine that § 270.10(*l*)(1) relates to the categories of information that can be required in a permit application, the Coalition's argument loses whatever force it might otherwise have had. Following the framework set out in *Ethyl Corp.*, we must uphold the challenged regulation so long as it establishes an identifiable standard governing the information that permitting authorities may request. We can set aside the regulation only if it creates no standard at all, instead delegating the decision regarding what information is required of permit applicants to permitting authorities. *See* 306 F.3d at 1149-50. We conclude that the regulation establishes an identifiable standard.

The first eight factors listed in the regulation are more than sufficient to guide the type of information that can be required of permit applicants. The regulation allows permitting authorities to require information in concrete categories, including: "[p]articular site-specific considerations such as proximity to receptors (such as schools, hospitals, [etc.]), unique dispersion patterns, etc.," *id.* § 270.10(*l*)(1)(i); "[i]dentities and quantities of nondioxin products of incomplete combustion most

likely to be emitted and to pose significant risk based on known toxicities," *id.* § 270.10(*l*)(1)(iii); and "[p]resence of significant ecological considerations, such as the proximity of a particularly sensitive ecological area," *id.* § 270.10(*l*)(1)(v).  Far from being standardless, the listed categories are relatively specific and serve to cabin a permitting authority's discretion with respect to the type of information it may seek.  Indeed, EPA stated in the Final Rule and again at oral argument that the most important factor is the eighth:  the "[a]dequacy of any previously conducted risk assessment, given any subsequent changes in conditions likely to affect risk."  *Id.* § 270.10(*l*)(1)(viii); *see* Final Rule, 70 Fed. Reg. at 59,515-16; Oral Arg. Recording at 1:04:00.  As EPA explained, because all cement kilns subject to the SSRA program currently have permits, *see* Oral Arg. Recording at 43:04, "[i]nstances where a facility may need to repeat a risk assessment would be related to changes in conditions that would likely lead to increased risk."  Final Rule, 70 Fed. Reg. at 59,516.  Hence, most information requests will be targeted at determining whether there has been a change in circumstances since the previous permitting process.

To be sure, the regulation's ninth provision -- which allows permitting authorities to request information regarding "[s]uch other factors as may be appropriate," 40 C.F.R. § 270.10(*l*)(1)(ix) -- is general.  But it does not render the regulation standardless.  The information requested under this provision must still be "necessary to determine whether additional controls are necessary to ensure protection of human health and the environment," *id* § 270.10(*l*), and "relevant to the potential risk from a hazardous waste combustion unit," *id.* § 270.10(*l*)(1).  Moreover, under "the established interpretive canon of *ejusdem generis*, '[w]here general words follow specific words,' the general words are 'construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.'" *Edison Elec. Inst. v. Occupational*

*Safety & Health Admin.*, 411 F.3d 272, 281 (D.C. Cir. 2005) (citation omitted). Thus, any information requested under the regulation's ninth factor must be "similar in nature" to that identified in the first eight.[8]

In sum, in contrast to the regulations at issue in *Ethyl Corp.* and *MST Express*, § 270.10(*l*) guides both regulated parties and permitting authorities with respect to the types of information that may be required in a permit application. As we acknowledged in *Ethyl Corp.*, "[t]here may, of course, be cases in which it is hard to distinguish between" a regulation that provides "vaguely articulated" guidance concerning a requirement (which we would review deferentially) and one that provides no guidance at all (and hence does not truly establish the requirement by regulation). 306 F.3d at 1149. But this is not one of those cases. Although the challenged regulation may "not provide as much detail as the petitioner wishes," Final Rule, 70 Fed. Reg. at 59,513, section 3005(b) of RCRA does not require more.

B

The Coalition's second objection to § 270.10(*l*) is that it is "impermissibly vague" with respect to the "trigger[]" for requiring an SSRA. Coalition Br. 35. In the Coalition's view, the regulation's trigger -- a conclusion by the permitting authority "that compliance with the [MACT standards] alone may not be *protective of human health or the environment*"-- is insufficiently specific to satisfy RCRA. The petitioner appears to level the same objection against 40 C.F.R. § 270.32(b)(3), the

---

[8]EPA agrees with this construction. *See* Oral Arg. Recording at 1:02:53 (EPA counsel's representation that the "catchall has to be understood within the context of the limitations" enumerated in the first eight factors).

companion regulation that articulates the standard for deciding whether a permitting authority must add conditions before approving a permit for a facility that has undergone an SSRA. That standard depends on a determination that "conditions are necessary in addition to those required under [the MACT standards] to ensure *protection of human health and the environment*." 40 C.F.R. § 270.32(b)(3) (emphasis added).

Unlike the argument that the Coalition directed at the information requirement of § 270.10(*l*), here its attack is clearly on the "too general" rather than the "no regulation at all" side of the line drawn by *Ethyl Corp. See supra* Part III.A. In fact, the petitioner had little choice in the matter since, by contrast to RCRA § 3005(b) -- which provides that permit applications must contain information required "under regulations" -- the Coalition concedes that no statute requires that the trigger for ordering an SSRA or approving a permit on the basis of an SSRA must be codified in a regulation. *See* Oral Arg. Recording at 18:20, 1:30:52. Section 3004(q) of RCRA, upon which EPA rests its authority to promulgate the challenged regulation, merely authorizes the agency to promulgate such "standards applicable to [HWCs] . . . as may be necessary to protect human health and the environment." 42 U.S.C. § 6924(q)(1); *see supra* note 2. RCRA's "omnibus" provision, upon which EPA also relies for authority to require SSRAs, provides that "[e]ach permit issued under this section shall contain *such terms and conditions as the [permitting authority] determines necessary* to protect human health and the environment." 42 U.S.C. § 6925(c)(3) (emphasis added). The relevant Senate Report makes clear that: "This provision . . . gives the Administrator . . . the authority to add permit terms and conditions *beyond those mandated in regulations* . . . . The provision is designed to deal with factors or situations different from those addressed in the regulations." S. REP. NO. 98-284, at 31 (1983) (emphasis added).

In short, the Coalition cannot argue that the triggers for ordering SSRAs or approving permits transgress a statutory command to set those triggers by regulation -- because there is no such statutory command. Instead, the Coalition simply argues that the triggers are impermissibly vague, an argument it can win only if it can show that EPA's failure to provide greater specificity constitutes an unreasonable interpretation of RCRA. *See, e.g.*, *Animal Legal Def. Fund*, 204 F.3d at 235; *American Trucking*, 166 F.3d at 378; *New Mexico*, 114 F.3d at 293.[9]  As we discussed in Part III.A, this is always a difficult burden for a petitioner to overcome.  *See Ethyl Corp.*, 306 F.3d at 1149 (citing *American Trucking*, 166 F.3d at 379-80, and *New Mexico*, 114 F.3d at 294).[10]  Here it is insurmountable, because § 270.10(*l*) does not merely define the triggers in terms of what is "protective of human health or the environment."  Rather, as discussed in Part III.A, the regulation provides nine relatively

---

[9]Although the Coalition's briefs appear to pose its specificity challenge as an attack on EPA's interpretation of RCRA, it might also have intended to argue that the asserted vagueness of § 270.10(*l*) renders the regulation arbitrary and capricious.  But such an argument would also fail because, as was true in *Animal Legal Defense Fund*, "[t]he explanation that renders the [agency's] interpretation of the statute reasonable" -- which we discuss below -- "also serves to establish that the final rule was not arbitrary and capricious."  204 F.3d at 235.

[10]*See also Animal Legal Def. Fund*, 204 F.3d at 235 ("[W]e accord agencies broad deference in choosing the level of generality at which to articulate rules."); *Metropolitan Washington Airports Auth. Prof'l Fire Fighters Ass'n v. United States*, 959 F.2d 297, 300 (D.C. Cir. 1992) ("[J]udicial deference is at its highest in reviewing an agency's choice among competing policy considerations, including the choice here of the level of generality at which it will promulgate norms implementing a legislative mandate." (citation omitted)).

specific factors to guide that determination. RCRA does not require more.

In its opening brief, the Coalition further argued that EPA should have defined what is protective of human health or the environment numerically, in terms of the threshold risk level that will trigger an SSRA or dictate unconditional approval of a permit.[11]  At oral argument, the Coalition receded from this claim, *see* Oral Arg. Recording at 1:34:32, 1:35:34, and sensibly so.  There is nothing in the statutory language that compels such a numerical definition.  *Cf. New Mexico*, 114 F.3d at 293 (holding that a statutory mandate to set "criteria" for waste plan certification "says nothing to suggest that the criteria must be detailed or quantitative").  To the contrary, section 3004(q)'s requirement that EPA promulgate "standards . . . as may be necessary to protect human health and the environment," 42 U.S.C. § 6924(q)(1), is reasonably read as authorizing standards that allow a case-by-case analysis rather than a uniform risk threshold.  Moreover, section 3005(c)(3) -- which states that "[e]ach permit . . . shall contain such terms and conditions as the [permitting authority] determines necessary to protect human health and the environment," *id.* § 6925(c)(3) -- was plainly intended to allow such an analysis.  *See* S. REP. NO. 98-284, at 31 (1983) ("This amendment gives the Agency the authority to address special cases and unique circumstances.").  And we certainly cannot interpret section 3004 to prohibit what section 3005 allows.  *See National Ass'n of Home Builders v. Defenders of Wildlife*, __ S. Ct. __, slip op. at 18 (June 25, 2007) ("In making the threshold determination under *Chevron*, 'a reviewing

---

[11]For example, with respect to cancer risks, a risk threshold might be presented as "1 x $10^{-5}$," signifying that an individual "is estimated to have up to a one in 100,000 chance of developing cancer during his/her lifetime from the exposure being evaluated."  Coalition Br. 5; *see id.* at 35.

court should not confine itself to examining a particular statutory provision in isolation.'" (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000)).

Moreover, EPA has reasonably explained why it chose the case-by-case approach. A national risk threshold, the agency explained, could not address unique site-specific considerations, such as unusual terrain or dispersion features, proximity to particularly sensitive populations, or unusually high contaminant background concentrations. *See* Final Rule, 70 Fed. Reg. at 59,505, 59,510-11. It "is important, and indeed essential," the agency said, "that risk managers be afforded sufficient flexibility to apply different target [risk] levels as dictated by the circumstances surrounding the combustor" at different sites. National Emission Standards for Hazardous Air Pollutants: Proposed Standards for Hazardous Air Pollutants for Hazardous Waste Combustors, 69 Fed. Reg. 21,198, 21,331 (Apr. 20, 2004) ("Proposed Rule"). For example, EPA explained that "a risk manager may wish to apply a more stringent carcinogenic target level for a combustor that is located in a densely populated area with a high concentration of industrial emission sources" than for one in an area without sensitive receptors. *Id.* We find nothing unreasonable about EPA's refusal to interpret RCRA to require a national standard for ordering an SSRA or granting a permit.[12]

---

[12]*See National Wildlife Fed'n v. EPA*, 286 F.3d 554, 566-67 (D.C. Cir. 2002) (concluding that EPA reasonably interpreted Clean Water Act § 301(b)(2) as permitting it to regulate color pollutants on a case-by-case basis, because their impact "is driven by highly site-specific conditions" (citation omitted)); *Chemical Waste Mgmt., Inc. v. EPA*, 976 F.2d 2, 31 (D.C. Cir. 1992) (holding that the corroborative testing requirement of a RCRA regulation was not "impermissibly vague" and that details "can be resolved on a site-specific, case-by-case basis").

For general support of its contention that EPA's SSRA regulation is impermissibly vague, the Coalition relies on *South Terminal Corp. v. EPA*, 504 F.2d 646 (1st Cir. 1974). In *South Terminal,* the First Circuit vacated an EPA regulation that conditioned construction of parking facilities in the Boston area on the receipt of an EPA "permit stating that construction or modification of such facility will not interfere with the attainment or maintenance of applicable Federal air quality standards." *Id.* at 657 n.8 (quoting 40 C.F.R. § 52.1135(d) (1974)). The court struck the regulation down on the ground that it "does not indicate how 'interference' is to be judged . . . . The prospective applicant for a permit is utterly without guidance as to what he must prove, and how." *Id.* at 670.

Unlike the regulation invalidated in *South Terminal*, § 270.10(*l*) *does* "indicate" how the permitting authority is to judge what is "protective of human health or the environment": by reference to the protection provided by the MACT standards alone. *See* 40 C.F.R. § 270.10(*l*). And it provides still further guidance by reference to a list of relatively detailed factors. *See supra* Part III.A (citing 40 C.F.R. § 270.10(*l*)(1)(i)-(ix)). That is more than sufficient to withstand a facial challenge -- which the Coalition insists is the only kind of attack it is mounting in this court. As we said in *Atlas Copco, Inc. v. EPA*:

> Admittedly, without express standards establishing precise guidelines, application of the . . . regulation is subject to abuse, but this is true of any testing capability. The solution lies not in a challenge to the facial validity of the program itself, for that is not where the potential for abuse exists. Rather, objection is more appropriately aimed at a particular application of the program, where it can be reviewed against the backdrop of its own particular circumstances.

642 F.2d 458, 466 (D.C. Cir. 1979); *see also* 42 U.S.C. § 6976(b) (providing for judicial review, in the appropriate regional circuit, of EPA "action . . . in issuing, denying, modifying, or revoking any permit under" RCRA § 3005).

C

The Coalition's final challenge to the regulation is that, in promulgating § 270.10(*l*), EPA failed to provide adequate notice of part of its rationale for the SSRA program, and likewise failed to respond to the Coalition's significant comments thereon. The APA requires that an agency publish notice of proposed rulemaking, including "either the terms or substance of the proposed rule or a description of the subjects and issues involved," 5 U.S.C. § 553(b)(3), and that it "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," *id.* § 553(c). A "notice of proposed rulemaking must provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully." *Honeywell Int'l, Inc. v. EPA*, 372 F.3d 441, 445 (D.C. Cir. 2004) (internal quotation marks omitted). And an agency must "demonstrate the rationality of its decision-making process by responding to those comments that are relevant and significant." *Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 468 (D.C. Cir. 1998).[13]   Hence, the Coalition suggests both that § 207.10(*l*) was promulgated "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), and (implicitly) that it is "arbitrary [or] capricious," *id.* § 706(2)(A).

---

[13]*See Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency . . . respond to 'relevant' and 'significant' public comments." (citation omitted)).

The Coalition's first contention is that EPA "failed to provide adequate public notice regarding its reasons for requiring SSRAs only from HWCs," and not from other types of hazardous waste management facilities (TSDs), such as landfills. Coalition Br. 43. But EPA did provide "sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully." *Honeywell*, 372 F.3d at 445. The notice set forth the text of the proposed regulation (which was expressly limited to HWCs) as well as its rationale. *See* Proposed Rule, 69 Fed. Reg. at 21,325-31, 21,358-59, 21,383. And while the discussion of the regulatory rationale did not explicitly note why non-HWCs were not covered, at least part of the reason was evident from the purpose of the rulemaking: it was intended to integrate the 1991 RCRA standards and the new Clean Air Act MACT standards for facilities subject to both. *See id.* at 21,358-59. Hazardous waste facilities that are not HWCs are not subject to both, because they do not produce emissions and so are not subject to the CAA. In any event, it is clear that the Coalition was in fact able to comment meaningfully -- and critically -- regarding the regulation's differential treatment of HWCs and non-HWCs. *See* [Coalition] Comments on the HWC MACT Replacement Standards Proposed Rule, at 116-17 (July 6, 2004) (J.A. 167-68). And that belies the petitioner's claim that the notice was insufficient.

The Coalition's second contention is that EPA failed to respond to its critical comments. This contention is also without merit. In the Final Rule, EPA specifically noted the Coalition's comments. *See* Final Rule, 70 Fed. Reg. at 59,512. It responded by explaining that it was requiring SSRAs for HWCs in order to ensure that the Clean Air Act's MACT standards are sufficiently protective to permit deferral of the 1991 RCRA standards; but because the MACT standards are not applicable to non-emission-producing facilities, the rationale for requiring SSRAs

for HWCs did not apply to such facilities. *Id.* EPA further explained that HWCs

> are distinct from other types of TSDs[, such as landfills, land treatment systems, etc.,] due to the wide array of waste streams being fed to the unit, the complex chemical processes throughout the combustion unit, stack emissions comprised of a wide variety of compounds that are difficult to address, and the potential to impact receptors for several square miles due to stack dispersion.

*Id.* Finally, the agency noted that, "to the extent permitting authorities believe there are problems with other types of TSDs, they can impose requirements and request additional information, including an SSRA in accordance with [40 C.F.R.] § 270.10(k)." *Id.* This response to the Coalition's comments was sufficient to satisfy the requirements of the APA.

IV

Finally, we consider the Coalition's attack on the HHRAP guidance document. The Coalition contends that the HHRAP is invalid because it was not promulgated pursuant to the notice-and-comment procedures of the APA. *See* 5 U.S.C. § 553(b), (c). While the "APA exempts from notice and comment interpretive rules or general statements of policy," *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 93 (D.C. Cir. 1997) (citing 5 U.S.C. § 553(b)), the Coalition maintains that the guidance document is not a policy statement but a legislative rule that is subject to those procedures.

EPA correctly points out that the merits of this APA challenge are inextricably linked to our jurisdiction to hear it. RCRA § 7006(a)(1) invests this court with jurisdiction over

petitions for review of EPA "action . . . in promulgating any regulation, or requirement under [RCRA,] or denying any petition for the promulgation, amendment or repeal of any regulation under [RCRA]." 42 U.S.C. § 6976(a)(1). We have held that this provision gives us "jurisdiction over 'only final regulations, requirements, and denials of petitions to promulgate, amend or repeal a regulation.'" *General Motors*, 363 F.3d at 448 (quoting *Molycorp*, 197 F.3d at 545); *see, e.g.*, *American Portland Cement Alliance*, 101 F.3d at 774-76. Under our precedents, the question of whether an agency document is a final "regulation . . . or requirement" under RCRA is substantially similar to the question of whether it is a legislative rule under the APA.[14] Thus, because we must decide whether we have jurisdiction before we may reach the merits, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998), and because there is no dispute that the HHRAP guidance document

---

[14]*Compare General Motors*, 363 F.3d at 448 (holding that "the ultimate focus of the inquiry" into whether this court has jurisdiction under RCRA "is whether the agency action partakes of the fundamental characteristic of a regulation, i.e., that it has the force of law" (quoting *Molycorp*, 197 F.3d at 545) (internal quotation mark omitted)), *and General Elec.*, 290 F.3d at 382 (holding, with respect to a jurisdictional provision analogous to RCRA, that agency action is reviewable if it "binds private parties or the agency itself with the 'force of law'"), *with McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C. Cir. 1988) (holding that an agency pronouncement is a "policy statement" exempt from APA notice and comment if it "first, does not have 'a present-day binding effect,' that is, it does not 'impose any rights and obligations,' and second, 'genuinely leaves the agency and its decisionmakers free to exercise discretion.'" (quoting *Community Nutrition Inst. v. Young*, 818 F.2d 943, 946 & n.4 (D.C. Cir. 1987))). Indeed, our jurisdictional cases routinely cite APA cases as authority. *See, e.g.*, *General Elec.*, 290 F.3d at 382 (citing *McLouth* and *Community Nutrition*); *American Portland Cement Alliance*, 101 F.3d at 776 (citing *McLouth*).

was not issued pursuant to APA rulemaking procedures, there are only two options: "Either the petition must be dismissed for lack of jurisdiction" because the guidance *is not* a final regulation under 42 U.S.C. § 6976(a)(1), "or the . . . [g]uidance should be vacated" on the merits because it *is* a final regulation but was promulgated in violation of the APA. *General Elec.*, 290 F.3d at 385 (internal quotation marks omitted).

"Three criteria determine whether a regulatory action constitutes the promulgation of a regulation" for purposes of RCRA § 7006(a)(1): "'(1) the Agency's own characterization of the action; (2) whether the action was published in the Federal Register or Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency.'" *General Motors*, 363 F.3d at 448 (quoting *Molycorp*, 197 F.3d at 545). The first two criteria militate against our jurisdiction here: the HHRAP states that it is not "a regulation itself," HHRAP at ii (J.A. 424), and the document was not published in either the Federal Register or the Code of Federal Regulations. Nonetheless, we have held that these criteria merely "'serve to illuminate the third, for the ultimate focus of the inquiry is whether the agency action partakes of the fundamental characteristic of a regulation, i.e., that it has the force of law.'" *General Motors*, 363 F.3d at 448 (quoting *Molycorp*, 197 F.3d at 545).

Under this framework, we have jurisdiction to review the HHRAP only if it "binds private parties or the agency itself with the 'force of law.'" *General Elec.*, 290 F.3d at 382. "An agency pronouncement [is] binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." *Id.* at 383 (citation omitted). As noted in Part II.B, the Coalition has expressly limited its challenge to the face of the document, and makes no argument that the agency has applied it in a way that indicates it is

binding. Indeed, such an argument would be unavailable in any event, as the HHRAP has not yet been applied to any facility. *See* Oral Arg. Recording at 1:31:34. Similarly, the Coalition insists, its challenge "does not involve any prediction of how EPA will actually implement th[e] regulatory regime" in the future. Coalition Reply Br. 2.

So limited, our disposition of the challenge is straightforward. We see nothing on the face of the HHRAP to suggest that it is binding. To the contrary, the document declares that "this guidance does not impose legally binding requirements on EPA, states, or the regulated community, and may not apply to a particular situation based on the specific circumstances of the combustion facility." HHRAP at ii (J.A. 424). Its pages are replete with words of suggestion: its provisions are described as "recommendations," *id.*, that permitting authorities are "encourage[d]" to "consider," *id.* at 1-8 (J.A. 460). The document states that "EPA and state regulators . . . retain their discretion to use approaches on a case-by-case basis that differ from those recommended in this guidance where appropriate." *Id.* at ii (J.A. 424). It further states that "[w]hether the recommendations in this [document] are appropriate in a given situation will depend on facility-specific circumstances." *Id.* Moreover, these statements are fully in accord with EPA's explanation of why "this is an area that is uniquely fitted for a guidance approach, rather than regulation": "[R]isk assessors must have the flexibility to make adjustments for the specific conditions present at the source, and . . . should be free to use the most recent [assessment tools] available rather than be limited to those that may be out-of-date because a regulation has not been revised." Proposed Rule, 69 Fed. Reg. at 21,330.

The Coalition rests its challenge to the HHRAP almost exclusively on our decision in *Appalachian Power Co. v. EPA*,

in which we found that another EPA guidance document was in fact a binding legislative rule. *See* 208 F.3d 1015, 1020-23 (D.C. Cir. 2000). But the factors that led us to that conclusion in *Appalachian Power* are not present here. Among other things, the agency does not treat the HHRAP as binding,[15] has not "le[d] private parties or . . . permitting authorities to believe that it will declare permits invalid unless they comply with [its] terms," *id.* at 1021, does not say that the HHRAP represents the agency's "settled position," *id.* at 1022, and has not issued a document that "reads like a ukase," *id.* at 1023. Unlike the guidance at issue in *Appalachian Power*, the HHRAP does not "command[,]" does not "require[,]" does not "order[,]" and does not "dictate[.]" *Id.* at 1023; *cf. General Elec.*, 290 F.3d at 380, 384-85 (finding that an EPA risk assessment document was a legislative rule, "because on its face it purports to bind both applicants and the Agency with the force of law"). Moreover, the Coalition has forsaken the contention -- also important in *Appalachian Power* -- that permitting authorities, "with EPA's Guidance in hand, are insisting on" compliance with the guidance during the site-by-site permitting process. 208 F.3d at 1023.

The Coalition protests that, although the current version of the HHRAP employs language of suggestion, an earlier version contained the language of command. It stresses that EPA issued the current version after we issued *Appalachian Power*, and that the agency expressly stated that it had edited the document's language in response to that decision. *See* Final Rule, 70 Fed. Reg. at 59,513. But we can hardly fault EPA for responding to an opinion of this court. There is nothing improper about an

---

[15]To the contrary, the agency insists that the HHRAP does "not impose mandatory requirements," and that it "offers numerous recommendations, but requires nothing." Final Rule, 70 Fed. Reg. at 59,513.

agency changing its language in light of one of our decisions or relying on the new language to defend itself upon judicial review. The Coalition is right, of course, that an agency's pronouncement that a document is non-binding will not make it so where there is evidence -- or practice -- to the contrary. *See Appalachian Power*, 208 F.3d at 1023. But the Coalition points to no such evidence here, and we have previously relied on similar disclaimers as relevant to the conclusion that a guidance document is non-binding. *See Molycorp*, 197 F.3d at 546; *American Portland Cement Alliance*, 101 F.3d at 776.

In short, having limited itself to a challenge based solely on whether the HHRAP guidance document is binding on its face, the Coalition has failed to point to any evidence suggesting that the document is anything other than what EPA asserts it is: a non-binding statement of EPA policy. Accordingly, we conclude that the HHRAP is not a final "regulation . . . or requirement" under RCRA § 7006(a)(1), and therefore that we are without jurisdiction to review it.

V

For the foregoing reasons, we deny the Coalition's petition for review with respect to its challenge to 40 C.F.R. § 270.10(*l*). With respect to its challenge to the HHRAP guidance document, we dismiss the petition for lack of jurisdiction.

*So ordered.*

APPENDIX

40 C.F.R. § 270.10

§ 270.10  General application requirements.

\*   \*   \*   \*

(*l*) If the Director concludes, based on one or more of the factors listed in paragraph (*l*)(1) of this section that compliance with the [MACT standards] alone may not be protective of human health or the environment, the Director shall require the additional information or assessment(s) necessary to determine whether additional controls are necessary to ensure protection of human health and the environment.  This includes information necessary to evaluate the potential risk to human health and/or the environment resulting from both direct and indirect exposure pathways.  The Director may also require a permittee or applicant to provide information necessary to determine whether such an assessment(s) should be required.

(1) The Director shall base the evaluation of whether compliance with the [MACT standards] alone is protective of human health or the environment on factors relevant to the potential risk from a hazardous waste combustion unit, including, as appropriate, any of the following factors:

(i) Particular site-specific considerations such as proximity to receptors (such as schools, hospitals, nursing homes, day care centers, parks, community activity centers, or other potentially sensitive receptors), unique dispersion patterns, etc.;

(ii) Identities and quantities of emissions of persistent, bioaccumulative or toxic pollutants considering enforceable controls in place to limit those pollutants;

(iii) Identities and quantities of nondioxin products of incomplete combustion most likely to be emitted and to pose significant risk based on known toxicities (confirmation of which should be made through emissions testing);

(iv) Identities and quantities of other off-site sources of pollutants in proximity of the facility that significantly influence interpretation of a facility-specific risk assessment;

(v) Presence of significant ecological considerations, such as the proximity of a particularly sensitive ecological area;

(vi) Volume and types of wastes, for example wastes containing highly toxic constituents;

(vii) Other on-site sources of hazardous air pollutants that significantly influence interpretation of the risk posed by the operation of the source in question;

(viii) Adequacy of any previously conducted risk assessment, given any subsequent changes in conditions likely to affect risk; and

(ix) Such other factors as may be appropriate.